**THIRD DIVISION**
**BARNES, P. J.,**
**BOGGS and BRANCH, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**March 11, 2015**

# In the Court of Appeals of Georgia

A14A1858. TURNER v. STATE.

BRANCH, Judge.

In April 2008, Marcus Turner was tried by a jury and convicted of burglary, two counts of kidnapping, aggravated assault, armed robbery, and three counts of possession of a firearm during the commission of a crime. He was sentenced to life imprisonment for the armed robbery conviction, concurrent twenty-year sentences for the burglary, kidnapping, and aggravated assault convictions, and five-year sentences for each of the three convictions for possession of a firearm during the commission of a crime, to run concurrently with each other and consecutively to the life sentence. Turner appeals all of his convictions and the denial of his motion for new trial. He contends that the trial court erred by allowing the State to use his silence against him, allowing witness statements to go out with the jury in violation of the continuing

witness rule, and incorrectly charging the jury on kidnapping. Finding no reversible error, we affirm.

On appeal from a criminal conviction, we view the evidence in the light most favorable to the verdict. *Jackson v. Virginia*, 443 U. S. 307 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). So viewed, the evidence showed that on November 16, 2007, Kendra Andrews was in her house with her boyfriend, DeRico Lewis, and their baby. When Andrews heard a knock at the door, she picked up her baby and opened the door slightly before two men pushed it in towards her. As she tried to push back, one man pulled out a gun and the other man, whom Andrews identified as Turner, grabbed her by the neck. While maintaining a grip on her neck, Turner pushed Andrews, who was still holding her baby, back to the bedroom and onto the bed. Turner continued to hold her neck while she was on the bed and held a liquor bottle over her and the baby in a threatening manner. The man with the gun, identified as Montrelle Teasley, asked Andrews where the money was, and she told him that her purse was on the dresser. When the men noticed that the shower water was running, they asked Andrews who was in there and she replied that it was her boyfriend. Teasley then went into the bathroom. When Andrews asked Turner not to hurt her

boyfriend, he responded, "shut up, bitch," and punched her in the face. She then asked him not to hit her baby and he said, "fuck that baby."

While Lewis was in the shower, he heard the bathroom door open and pulled back the shower curtain to see Teasley pointing a gun at his face. Teasley asked him where the money was, and Lewis told him that it was in his pants on the bathroom floor. After Teasley got the money from Lewis's pants, Lewis grabbed the gun. Teasley turned it and fired, hitting Lewis in the forearm. Lewis ultimately gained control of the gun and shot at Teasley and Turner, who still had Andrews and the baby pinned down on the bed. Lewis eventually got both men out of the house, and Andrews contacted the police.

That same day, Charles Norton of the Richmond County Sheriff's Office was dispatched to the hospital based on a report of two men arriving with gunshot wounds. One of the men was Turner. When Officer Norton asked him about the gunshot wound that he had received,[1] Turner told him that he was walking down the road and someone in an unknown vehicle fired shots at him. Turner said that the incident had occurred approximately two hours before he came to the hospital.

---

[1] Because Turner was not a suspect at the time, Norton did not read him his *Miranda* rights before talking to him.

Shawn Newsome, an investigator with the Richmond County Sheriff's Office, took statements of the incident from Andrews and Lewis. At the police station, Newsome separated Andrews and Lewis and showed them photographic lineups. They both picked Turner out of the lineup as a suspect. Turner and Teasley were subsequently arrested.

Rochelle Johnson of the Georgia Bureau of Investigation performed DNA typing on a jumpsuit worn by Turner, a jacket worn by Teasley, and buccal swabs from Lewis, Teasley, and Turner. She determined that blood found on Turner's jumpsuit and on Teasley's jacket came from Lewis.

Turner testified in his defense and admitted that he was at the house with Teasley and that Teasley knocked on the door. He then heard two gunshots fired and went up to the door, which was open, and saw Teasley and the victims facing each other. He dropped the liquor bottle that he had been holding, grabbed Teasley, and pulled him out the door. He was shot in the arm before the door slammed behind him. When he was asked about his conversation with Officer Norton at the hospital, Turner said that Norton had asked if he had ever been shot before and that he was telling Norton about a prior shooting incident.

On cross-examination, Turner was asked, "When did you tell the police the version of events that you're telling us today?" Turner's counsel objected that it was "possibly an area of objection" because Turner had a right to remain silent and did not have to tell the police his story. The court overruled the objection and the following transpired:

> [PROSECUTOR]: Please tell the jury when you told police the story that you're telling us today.
> [TURNER]: I never told the police the story, sir.
> [PROSECUTOR]: In fact, this is the first time that anybody's ever heard about it; isn't that right?
> [TURNER]: No, sir. This ain't the first time anyone's heard about this, sir.
> [PROSECUTOR]: This is the first time that you've told anyone involved with this case, your current version of what happened, isn't that right?

Turner responded that he had told his lawyer that version, but admitted that the trial was the first time anyone else had heard that what he had tried to do that night was to help.

1. Turner contends that the trial court erred by allowing the State to use his silence against him during his cross-examination in violation of *Doyle v. Ohio*, 426

5

U. S. 610 (96 SCt 2240, 49 LE2d 91) (1976). Because *Doyle* is inapplicable here, we discern no error.

In *Doyle*, the United States Supreme Court held that the use for impeachment purposes of a defendant's silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment. *Doyle*, 426 U. S. at 619 (II). The Georgia Supreme Court has held that in criminal cases "a comment upon a defendant's silence or failure to come forward . . . will not be allowed even where the defendant has not received *Miranda* warnings and where he takes the stand in his own defense." *Mallory v. State*, 261 Ga. 625, 630 (5) (409 SE2d 839) (1991), overruled on other grounds, *Chapel v. State*, 270 Ga. 151, 155 (4) (510 SE2d 802) (1998), as recognized in *Clark v. State*, 271 Ga. 6, 9 (5) (515 SE2d 155) (1999).[2]

This case, however, is distinguishable on its facts from *Doyle* and *Mallory*. Turner did not remain silent, but gave his version of events to Officer Norton while he was in the hospital. Because Turner "had chosen to speak to the investigating

---

[2] *Mallory* was decided under the old rules of evidence, but the Georgia Supreme Court has offered no opinion about the continuing viability of *Mallory* under the new Evidence Code. See *Romer v. State*, 293 Ga. 339, 343 (2), n. 4 (745 SE2d 637) (2013); *Yancey v. State*, 292 Ga. 812, 817 (2), n. 9 (740 SE2d 628) (2013).

officer, the State could properly impeach him with his prior inconsistent statement[]."

*Kendrick v. State*, 287 Ga. 676, 678 (2) (699 SE2d 302) (2010) (citations omitted);

see also *Anderson v. Charles*, 447 U. S. 404, 408 (100 SCt 2180, 65 LE2d 222)

(1980)*(Doyle* does not apply to cross-examination that merely inquires into prior

inconsistent statements; although "[e]ach of two inconsistent descriptions of events

may be said to involve 'silence' insofar as it omits facts included in the other version,

. . . *Doyle* does not require any such formalistic understanding of 'silence.'"); *Carter*

*v. State*, 324 Ga. App. 118, 126 (2) (b) (749 SE2d 404) (2013) (where appellant was

not silent and willingly talked to detective, *Mallory* principle did not require the

exclusion of testimony about her failure to mention certain facts during her interviews

with police officers). Accordingly, the trial court did not err in allowing the State to

cross-examine Turner about his prior inconsistent statement.

2. Turner contends that the trial court erred by allowing photographic lineup

identification forms signed by Andrews and Lewis to go out with the jury, thereby

violating the continuing witness rule. We disagree.

The photographic lineup identification forms included the following

information: instructions for the lineup, the witnesses' signatures, the witnesses'

initials under the number of the photograph the witness selected from the lineup, the

7

date and time of the selection, and the signature of the investigator who conducted the lineup. Turner's counsel objected to the forms going out with the jury based on a violation of the continuing witness rule. The trial court overruled the objection.

> In Georgia, the continuing witness objection is based on the notion that written testimony is heard by the jury when read from the witness stand just as oral testimony is heard when given from the witness stand. But, it is unfair and places undue emphasis on written testimony for the writing to go out with the jury to be read again during deliberations, while oral testimony is received but once. The types of documents that have been held subject to the rule include affidavits, depositions, written confessions, statements, and dying declarations.

*Davis v. State*, 285 Ga. 343, 348 (8) (676 SE2d 215) (2009) (citations and punctuation omitted). The photographic lineup identification forms are documents supporting a photographic lineup, however, and are not equivalent to testimony, but rather are documentary evidence of the lineup itself. *Dockery v. State*, 287 Ga. 275, 276-277 (4) (695 SE2d 599) (2010). Accordingly, the admission of these exhibits did not violate the continuing witness rule. Id; *Kenney v. State*, 196 Ga. App. 776, 777 (2) (397 SE2d 131) (1990) (photographic lineup documents not viewed as statements of witness, but as tools to explain the photographic lineup display shown to witnesses prior to trial).

3. Turner contends that the trial court erred by incorrectly charging the jury on the offense of kidnapping in violation of *Garza v. State*, 284 Ga. 696 (670 SE2d 73) (2008). We agree that Turner is entitled to a jury instruction consistent with the rule established in *Garza*, but conclude that the charging error was not reversible.

In this case, the trial court instructed the jury that

a person commits the offense of kidnapping when he abducts or steals away any person without lawful authority or warrant and holds such person against his will. I further charge you that any unlawful taking or movement of a person, however slight, is sufficient to show the abduction or stealing away of a person. The distance the person is carried is not material.

The charge given was a correct statement of the law at the time of Turner's trial, but in *Garza*, the Georgia Supreme Court overruled prior law regarding the need for only slight movement to satisfy the asportation element of kidnapping and set out a four-part test to determine whether the movement at issue constitutes asportation. *Garza*, 284 Ga. at 702 (1).

Because *Garza* must be applied retroactively, the given charge is rendered erroneous, and Turner is entitled to a jury instruction consistent with the rule established in *Garza* with respect to satisfaction of the asportation element of

9

kidnapping.[3] *Hammond v. State*, 289 Ga. 142, 144 (2) (710 SE2d 124) (2011); *Arnold v. State*, 324 Ga. App. 58, 64 (3) (749 SE2d 245) (2013). Nonetheless, Turner's kidnapping conviction should be upheld if, after applying the *Garza* factors, it is still "highly probable that the [erroneous jury charge] did not contribute to the judgment." *Arnold*, 324 Ga. App. at 64 (3) (citation and punctuation omitted).

The four factors that should be considered in determining whether the movement at issue constitutes asportation include:

> (1) the duration of the movement; (2) whether the movement occurred during the commission of a separate offense; (3) whether such movement was an inherent part of that separate offense; and (4) whether the movement itself presented a significant danger to the victim independent of the danger posed by the separate offense.

*Garza*, 284 Ga. at 702 (1) (citation and footnote omitted). Not all four factors must be satisfied to establish that asportation has occurred. *Hammond*, 289 Ga. at 144-145 (2). And "even a minimal movement that enhances the control of the perpetrator over the victim will constitute asportation when it is not an inherent part of a separate offense." *Arnold*, 324 Ga. App. at 62-63 (2) (citations omitted).

---

[3] Following *Garza*, the Georgia General Assembly amended the kidnapping statute, OCGA § 16-5-40, but the revised statute only applies to crimes committed on or after July 1, 2009. Thus, the *Garza* rule is applicable here.

Here, we assume without deciding that the first factor of the *Garza* test was not established because the movement of Andrews and the baby was from the living room to the bedroom and was of minimal duration. The evidence did, however, establish the last three factors of the *Garza* test. The movement did not occur during the commission of a separate offense against Andrews and the baby because the burglary (OCGA § 16-7-1) had already been completed when they entered the house,[4] the aggravated assault (OCGA § 16-5-21) occurred after the movement to the bedroom (when Teasley brandished a handgun while demanding money from Andrews), and the victim of the armed robbery (OCGA § 16–8-41) was not Andrews, but Lewis (robbery of money from his pants by use of a handgun). Nor was the movement an inherent part of the other crimes because it was not necessary to effect the completion of the burglary or aggravated assault. See *Henderson v. State*, 285 Ga. 240, 245 (5) (675 SE2d 28) (2009) (movement within duplex was minimal but such movement not inherent part of armed robbery, which had already been completed); *Holden v. State*, 314 Ga. App. 36, 38 (1) (722 SE2d 873) (2012) (movement from kitchen to bedroom not inherent part of rape, aggravated sodomy, or armed robbery); *Dixon v. State*, 303

---

[4] See *Whittlesey v. State*, 192 Ga. App. 667, 668 (385 SE2d 757) (1989) (crime of burglary complete at time appellant entered the residence without authority and with intent to commit a felony therein).

Ga. App. 517, 519 (1) (693 SE2d 900) (2010) (movement from hotel room door to bed occurred before aggravated assault and rape occurred and was not inherent part of either offense). Further, the movement created an additional danger to Andrews and the baby because it moved them farther from the front door, a possible means of escape, and it enhanced Turner's control over them. See *Peralta v. State*, 312 Ga. App. 414, 416 (1) (718 SE2d 326) (2011); *Holden*, 314 Ga. App. at 38 (1).

Based upon the evidence in this case, it is highly probable that the trial court's error in not instructing the jury to consider the asportation element of kidnapping using the *Garza* factors did not contribute to the judgment of guilt on the kidnapping charge. Accordingly, the trial court's error is not reversible.

*Judgment affirmed. Barnes, P. J., and Boggs, J., concur*.